**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. Nos. 1:10-CR-183** |
| | : | **1:11-CR-003** |
| **v.** | : | |
| | : | **Judge Sylvia H. Rambo** |
| **DAVID RICHARD DODD, II** | : | |

## O P I N I O N

In this criminal case arising out of the misappropriation and laundering of federally funded loans, Defendant pleaded guilty to two substantive counts of an eleven count indictment. Presently before the court is the Government's request for the court to order restitution pursuant to the provisions of the Mandatory Victims Restitution Act, codified at 18 U.S.C. § 3663A. The issue presented herein is whether the entities claiming restitution, many of whom contracted construction work on the multimillion dollar project receiving federal funds for which Defendant assumed the roles of owner, project manager, and architect/engineer, are "victims" as the term is defined by the Act. For the following reasons, the court finds that these entities are victims, and finds Defendant's conduct to be the direct and proximate cause of their losses. Accordingly, Defendant will be held liable for restitution in the aggregate amount of $20,943,635.13.

## I. Background

This case involves a complex scheme orchestrated by Defendant, David R. Dodd II, over a four year period. In short, Defendant structured transactions to self-deal in relation to a construction project that received federal funds, whereby he profited in excess of $1.1 million. By doing so, Defendant misappropriated funds from the Department of Housing and Urban Development that were intended for the

Capital View Commerce Center ("CVCC") project located in the Middle District of Pennsylvania. The CVCC was planned to be a 215,000-square-foot printing, office, and retail facility, located in an economically disadvantaged area of Harrisburg, Pennsylvania, that was also subject to a Brownsfield Economic Development Initiative Grant. (Tr. 90.)

The Government identified twelve entities that claim they qualify as victims and are owed restitution under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A ("MVRA"), due to Defendant's actions related to the offenses of conviction, and the parties have stipulated the amount of restitution claimed to be $21,487,057.58. (*See* Doc. 64.) While the Government argues that the court should award the full stipulated amount, Defendant contests his obligation for any amount, arguing that his actions were not the direct and proximate causes of these entities' losses. He reasons, therefore, that he does not owe any restitution to these entities. Thus, the point of contention, and the only issue before the court, is whether Defendant's actions were the direct and proximate cause of the losses suffered by the identified entities. As part of the court's determination rests on amounts identified in the parties' February 6, 2013 stipulation, the court believes it helpful to set forth the pertinent procedural history in this matter before discussing the evidence presented in support of an order of restitution.

A.    **Procedural History**

On June 9, 2010, Defendant was charged in an eleven-count indictment, which included three counts of theft of government funds, in violation of 18 U.S.C. § 641 (Counts I, III & V), three counts of misappropriation of funds from a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A) (Counts II, IV, VI),

two counts of money laundering, in violation of 18 U.S.C. § 1956 (Counts VII & VIII), one count of misrepresentations to influence a financial institution, in violation of 18 U.S.C. § 1014 (Count IX), and one count of bank fraud, in violation of 18 U.S.C. § 1344 (Count X), as well as a forfeiture allegation (Count XI). On November 15, 2011, Defendant appeared before the undersigned and pleaded guilty, pursuant to an agreement (Doc. 38), to Counts II and VII, as well as the civil forfeiture count at Count XI[1] (*see* Docs. 74 & 41). As part of the plea agreement, Defendant acknowledged that, pursuant to the MVRA, the court is "required in all instances to order full restitution to all victims for the losses those victims ha[d] suffered as a result of [his] conduct," which included "conduct underlying the charges of conviction as well as all other charges dismissed as part of [the] plea agreement." (Doc. 38, ¶ 10A.) Defendant further agreed that the court may order restitution to persons other than the victims of the specific offense of conviction, and acknowledged that, "if either the amount of loss involved or restitution [he] owed . . . [could not] be agreed upon prior to sentencing, then the United States [would] be required to prove the amount of loss involved and the amount of restitution that is owed at an appropriate hearing before the district court where the standard of proof will be by a preponderance of the evidence." (*Id.*) The court accepted Defendant's guilty plea. (Doc. 42.)

On January 25, 2012, the United States Probation Officer prepared a draft presentence report ("PSR"). It is the Probation Office's practice to submit to the parties "draft" PSRs before sentencing hearings so that parties have notice and

---

[1] Defendant also pleaded guilty to a civil forfeiture allegation, brought pursuant to 18 U.S.C. § 982, set forth in Count XI at docket 1:11-CR-0003. (Doc. 74.)

opportunity to object. *See* LCrR 32.1. Relevant to the issue *sub judice*, the draft PSR identified thirteen entities that maintain they are owed restitution.[2] Defendant timely served a lengthy objection to the PSR, pursuant to Federal Rule of Criminal Procedure 32. (Doc. 46.) Defendant contended he was not the direct and proximate cause of the losses claimed by the identified entities, and therefore, those entities were not "victims" as defined by the MVRA. (*See id.*)

On October 31, 2012, the court commenced a hearing restricted to the issue of whether restitution is owed. (Docs. 48 & 49.) Assistant United States Attorney William A. Behe represented the Government, and Attorney Jordan D. Cunningham represented Defendant, who was personally present. At the hearing, the court afforded the parties the opportunity to present evidence on the issue of restitution. The hearing lasted five days.[3] On February 6, 2013, the parties provided the court with a stipulation, which they represented reflected the amount to which the entities that were seeking restitution claimed they were entitled. (Doc. 64.) The stipulation, as filed, defined its purpose and provided as follows:

> [The parties] stipulate that if the appropriate witnesses were
> called to testify by the United States, the witnesses for each
> contractor, political subdivision, and bank would testify to

---

[2]  The draft PSR identified the following entities as victims claiming restitution: (1) H&R Mechanical, that claimed $1,225,468.62; (2) HW Nauman & Son, Inc., that claimed $31,672.47; (3) Herre Brothers, Inc., that claimed $1,265,237.50; (4) Joseph Stong, Inc., that claimed $308,755.40; (5) Stewart-Amos Steel, Inc., that claimed $661,858.00; (6) Ciesco, that claimed $118,218.11; (7) Macri Concrete, that claimed $323,058.00; (8) Shaedler Yesco Distribution, that claimed $390,767.05; (9) Weaver's Glass, that claimed $489,890.00; (10) Dauphin County, that claimed $2,832,450.64; (11) City of Harrisburg, that claimed $6,793,489.16; (12) Nicholas Evanoff Co., that claimed $129,276.80; and (13) Metro Bank, that claimed $6,573,346.80.

[3]  The initial hearing lasted four days and concluded on November 6, 2012. On January 8, 2013, the Government filed a motion requesting the court permit it to present additional testimony on the issue of restitution. (Doc. 57.) The court granted the Government's motion over Defendant's objection, and held a fifth day of hearing on February 21, 2013. (Doc. 63.)

> the authenticity of the Payment Application Date; Payment
> Application Number; Payment Application Amount; Total
> of Payment Applications; Amount Claimed Outstanding;
> Legal Fees; Payments Received; and Total Outstanding as
> set forth on the attached Exhibit "1".

(*Id.*)  The Exhibit attached thereto included nine contractors that claimed they were entitled to restitution due to Defendant's failure to pay for work performed on the CVCC project ("Contractors"), a financial institution that claimed it was owed restitution for a private loan it made to Defendant for purposes of financing the CVCC project ("Metro Bank"), and two municipal entities, Dauphin County and Harrisburg City, that each claimed they were owed restitution for Section 108-backed loans that they became primarily responsible for repaying due to the failure of the project (collectively, "Funding Agencies" or "Funding Sources").  (Doc. 64-1.)  In total, the parties agreed that, if called during the restitution hearing, the entities would claim they were entitled to $21,487,057.58 in restitution, although Defendant maintained his position that he should not be accounted for such an amount because he was not the cause of said entities' losses.  Rather, Defendant contended that the project was terminated – and the entities remained unpaid – due to the Contractors' breaches of the Contract Documents.  Following the parties' filing of their proposed findings of fact and conclusions of law (Docs. 78 & 84) and briefs on the issue of restitution (Docs. 75 & 81)  the court heard oral argument.

### B.    Facts

The facts relevant to the court's determination of whether Defendant should be ordered to pay restitution are as follows.  Defendant owned and operated several companies, namely: (1) Advanced Communications Agency ("Advanced Communications"), a commercial printing business; (2) Cameron Real Estate, LP

5

("CRE"), the "Owner" of the CVCC project; (3) Cameron Management ("CM"), the project manager of the CVCC project; and (4) Industrial Design and Construction ("IDC"), a company that supplied the pre-cast concrete beams to be used in the project. In addition to funding provided by Advanced Communications, Defendant obtained funds for the CVCC project through various sources, including Pennsylvania state grants and loans, private bank loans, assistance from Harrisburg City, grants issued by the Community Action Commission that were funded by the United States Department of Health and Human Services, and Harrisburg City and Dauphin County grants and loans funded by the Department of Housing and Urban Development. (Tr. 88-90.) In total, the project was scheduled to receive over $24 million in funding. Because much of that funding was through state and federal loan and grant programs,[4] the project was subject to certain federal and state regulations.[5]

Defendant concealed his personal interest in IDC (Tr. 440-41), and through that concealment (Tr. 95), obtained over one million dollars of federal funds

---

[4] At the hearing, George Conner, the deputy director of Dauphin County Economic Development Department, explained that the agency administers grant and loan programs for Dauphin County, which includes, *inter alia*, the administration of the Community Development Block Grant Program ("CBGP") from the Department of Housing and Urban Development ("HUD"). (Tr. 87.) Conner explained that the CBGP is for economic development projects in the community, which may include a for-profit business, and that the agency is able to make loans to qualifying projects that are guaranteed by the CBGP itself, which is subject to repaying the borrowed HUD funds. (Tr. 88-90.) Conner testified that, for the CVCC project, both Harrisburg City and Dauphin County committed to Section 108-backed loans of $3.79 million and $3 million, respectively, through their HUD-funded programs. (Tr. 90.) Bryan Davis, the executive director of the Harrisburg Redevelopment Authority, testified that Section 108 money through the Harrisburg City program is governed by the same regulations as the CBGP. (Tr. 131.) Both Harrisburg City and Dauphin County are liable for repayment of the borrowed Section 108 funds, which are secured by the CBGP funds.

[5] The court notes that the Government argued in its brief that, despite the Contract Documents containing express language to the contrary, the project was, in fact, not technically subject to the Buy America provisions. Whether the project was subject to these requirements is not material due to the court's ultimate disposition of the restitution issue.

from programs administered by Harrisburg City and Dauphin County through the sale of pre-cast concrete from IDC to CRE for the CVCC project, an act that was in violation of federal conflict of interest regulations (*see* Doc. 74, pp. 15-16). The focus of Defendant's action central to the issue of restitution, however, is related not to this self-dealing transaction, but rather to his receipt of reimbursement payments from the municipal entities that he represented would be distributed to the contractors for their work performed on the CVCC project but, in fact, was diverted to other destinations.

Specifically, CRE, as the Owner of the project, contracted with multiple entities to perform work on the CVCC project. Douglas Aldinger, who was employed by Erdman Anthony, an engineering firm that Defendant engaged to assist with the CVCC project, testified that the firm participated in drafting the Contract Documents that were given to each contractor.[6] (Tr. 552-53.) The Contract Documents contained several provisions pertinent to Defendant's argument in opposition to an order of restitution. Specifically, the Contract Documents required that a contractor submit a standard form application for payment, which corresponded to a schedule of values that were set and allocated to various portions of the work. (J.Ex. 1, § 9.3.1.) The Contract Documents further provided that:

> The Architect/Engineer will, within seven days after receipt of the Contractor's Application for Payment, *either issue to the Owner a Certificate for Payment, with a copy to the Contractor, for such amount as the Architect/Engineer determines is properly due, or notify the Contractor and Owner in writing of the Architect/Engineer's reasons for*

---

[6] The Contract Documents were submitted to the court in their entirety following the court's request. These Contract Documents represent the pertinent documents forming the agreement between the Owner and the Contractors, and will be cited as Joint Exhibit 1 ("J.Ex. 1").

> *withholding certification in whole or in part as provided in
> Section 9.5.1.*

(*Id.* at § 9.4.1 (emphasis supplied).)  The Contract Documents explained the

significance of a Certificate for Payment as follows:

> The issuance of a Certificate for Payment *will constitute a
> representation by the Architect/Engineer to the Owner*,
> based on the Architect/Engineer's evaluation of the Work
> and the data comprising the Application for Payment, that
> the Work has progressed to the point indicated and that, to
> the best of the Architect/Engineer's knowledge,
> information and belief, *the quality of the Work is in
> accordance with the Contract Documents. . . . The
> issuance of a Certificate for Payment will further constitute
> a representation that the Contractor is entitled to payment
> in the amount certified*.  However, the issuance of a
> Certificate for Payment will not be a representation that the
> Architect/Engineer has (1) made exhaustive or continuous
> on-site inspections to check the quality or quantity of the
> Work, (2) reviewed construction means, methods,
> techniques, sequences or procedures, (3) reviewed copies
> of requisitions received from Subcontractors and material
> suppliers and other data requested by the Owner to
> substantiate the Contractor's right to payment, or (4) made
> examination to ascertain how or for what purpose the
> Contractor has used money previously paid on account of
> the Contract Sum.

(*Id.* at § 9.4.2 (emphasis supplied).)  The Contract Documents set forth the bases

upon which the Architect/Engineer could withhold a Certificate for Payment as

follows:

> The Architect/Engineer may withhold a Certificate for
> Payment in whole or in part, *to the extent reasonably
> necessary to protect the Owner*, if in the
> Architect/Engineer's opinion the representations to the
> owner required by Section 9.4.2 cannot be made.  *If the
> Architect/Engineer is unable to certify payment in the*

*amount of the Application, the Architect/Engineer will notify the Contractor and Owner as provided in Section 9.4.1.* If the Contractor and Architect/Engineer cannot agree on a revised amount, *the Architect/Engineer will promptly issue a Certificate for Payment for the amount for which the Architect/Engineer is able to make such representations to the Owner.* The Architect/Engineer may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the Architect/Engineer's opinion to protect the Owner from loss for which the Contractor is responsible, including . . . :

\*   \*   \*

(.8)   Failure to comply with government statutes, regulations and laws.

(.9)   Failure to submit required Wage documentation.

(*Id.* at § 9.5.1 (emphasis upllied).)  However, withholding a Certificate for Payment was not unrestrained, as Section 9.5.2 provided that Certificates for Payment must be issued for amounts previously withheld once the reasons for initially withholding certification were removed.  (*See id.* at § 9.5.2.)  Upon the Architect/Engineer's issuance of a Certificate for Payment, the Owner was required to remit payment to the Contractor.  (*Id.* at § 9.6.1.)

Defendant bases his argument in opposition to restitution upon the obligations set forth in the Contract Documents related to the Contractors' compliance with the Federal Buy America Act, codified at 23 U.S.C. § 313 and 23 C.F.R. § 635.410, and the Pennsylvania Steel Products Procurement Act ("Steel Act"), codified at 73 P.S. §§ 1881-1887.  The provision pertaining to the Buy America Act was set forth in the Contract Documents as follows:

9

> All Federal-aid construction projects must either require no
> permanently incorporated steel and/or iron materials, or
> require that all steel and iron materials used in the project
> be manufactured in the United States. "Manufactured in
> the United States" means that all manufacturing processes
> starting with the initial mixing and melting through the
> final shaping and coating processes must be undertaken in
> the United States.

(J.Ex., § 3.9(A).)  In addition to the Buy America Act reference, the Contract

Documents incorporated provisions of the Steel Act, which required that:

> Every public agency shall require that every contract
> document for the construction, reconstruction, alteration,
> repair, improvement or maintenance of public works
> contain a provision that, if any steel products are to be used
> or supplied in the performance of the contract, only steel
> products as herein defined shall be used or supplied in the
> performance of the contract or any subcontracts thereunder.

73 P.S. § 1884.  The Steel Act further defined "public works" as: "Any structure,

building, . . . or other betterment, work or improvement whether of a permanent or

temporary nature and whether for governmental or proprietary use." 73 P.S. § 1886.

The Contract Documents ensured compliance with these regulations by conditioning

certain payments on compliance with the Steel Act:

> The Contractor/Supplier shall certify that all steel and cast
> iron products to be supplied in this contract comply with
> this Act. *No payment will be made to the
> Contractor/Supplier for steel and cast iron products until
> such certification has been received.*

(J.Ex., § 3.9(C) (emphasis supplied).)

　　　　The public funding portion of the project was largely by way of

reimbursement programs.  George Conner, the deputy director of the Dauphin

10

County Economic Development Department, explained that the funds were distributed by way of reimbursements, inasmuch as the Owner would submit to the Funding Agencies an invoice for the actual construction costs, which would identify the name of the vendor that performed the work and the work that was completed. (*See* Tr. 94-104.)  The Funding Agency paid the Owner the exact amount listed on the invoice.  The Owner, in turn, was required to pay the vendor for the amount submitted to and paid by the Funding Source.  (*See* Tr. 93, 134.)  Conner unequivocally testified that the Owner was not to use the funds for any purpose other than paying the specific vendor identified on the invoices[7] (*see* Tr. 93), and further

---

[7]  At the hearing, Conner testified as follows regarding the process Defendant, as Owner, had to follow to get the loan proceeds:

> Q:     [H]ow would [Defendant] get from the County the money from the Section 108 Loan? What is the process that he would go through?
>
> A:     The process would be for him to submit the actual invoice for the detailed actual construction, whether company or what have you, that he submitted.  And we were to pay that exact invoice for that particular company.
>
> Q:     [I]f [Defendant] submits a request for payment, an invoice, to you for 108 Loan money, it's accompanied by an invoice for a specific purpose, specific vendor to be paid?
>
> A:     Correct.
>
> Q:     If he receives that money from the County, is he permitted to spend it on anything other than the person who's identified in the invoice as being owed that money?
>
> A:     *Absolutely not.*

(Tr. 92-93 (emphasis supplied).)  The court notes that the payment provision contained at Paragraph II.D of the Loan Agreement between Dauphin County's Office of Community and Economic Development and CRE can be read to permit payment of all eligible expenses from Section 108 funds.  (*See* Def. Ex. 56, ¶ II.D.)  However, the issue is not whether Defendant used the Section 108 Funds to pay ineligible expenses, but rather whether Defendant's failure to pay the Contractors was the direct and proximate cause of the Contractors' losses.  Thus, whether Defendant acted pursuant to the agreement between CRE and Dauphin County by using the Section 108 Funds to pay expenses other than the Contractors is not a dispositive issue.

explained that the Owner's submission of a payment request and supporting documentation represented to the Funding Agency that the Contractor's work was eligible and in compliance with the Contract Documents[8] (Tr. 120). Similarly, Bryan Davis, the executive director of the Harrisburg Redevelopment Authority, explained that an Owner's submission of a request for payment for a specific vendor in a specific dollar amount represents to the Funding Agency that the vendor identified is entitled to the amount requested, and that the Owner was using the requested funds to make the represented payment. (Tr. 134.) Kathy Possinger, the former deputy director for the City of Harrisburg's Department of Housing, similarly testified that the Section 108 program required the identified Contractor to be paid the specific amount certified by the Owner in the certificate and application for payment. (Tr. 178.)

---

[8] On redirect, Conner testified as follows regarding the significance of submitting a payment application:

> Q:    [D]oes [Defendant] have to account who he pays [Section 108] money to?
>
> A:    Absolutely.
>
> Q:    When he submits requests for payment to you along with the AIA and invoice for the specific vendor?
>
> A:    Yes, sir.
>
> Q:    What does that tell you in terms of that contractor or vendor's compliance with their contract obligations?
>
> A:    That it's eligible, it's in compliance, and we know that when we get monitored, we will have all the documentation in order to be in compliance and have approved monitoring.
>
> Q:    So your payment of these checks to [Defendant] was based on his representation to you that everything had been in compliance?
>
> A:    Correct.

(Tr. 120.)

The record demonstrates that, based on Defendant's representations, the Funding Agencies paid him the amounts he represented were owed to the Contractors for eligible expenses. In fact, payments to Defendant were in the exact dollar amount for which he requested payment. (*See, e.g.,* Gov. Exs. 8-16.) Such a process was clearly contemplated by the application and certificate for payment, which provided as follows:

> This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

(*See, e.g.*, Gov. Ex. 16.) Despite these representations, which resulted in the Funding Agency's disbursement of funds directly to Defendant for the payment of the entities represented on the applications, Defendant withheld the payments earmarked for the Contractors, and instead used the money to pay other "eligible expenses," including payments to companies in which he had a personal stake, such as IDC and CM. (Tr. 305, 388-90; Def. Ex. 79.)

The gravamen of Defendant's position that the Contractors were not owed payment rests on the premise that the Contractors had not perfected their contractual obligations due to their failure to comply with the steel certifications.[9] Citing to Section 9.5.1.8 of the Contract Documents, defense counsel zealously argued that the Contractors were not entitled to receive payment because no such

---

[9] The court also notes that Defendant argued that at least one subcontractor had a Davis-Bacon Wage Act certification compliance issue. Because the significance of this alleged compliance issue is identical to the steel certificate compliance issue, neither of which the court finds dispositive to the issue of restitution, the court will address this alleged noncompliance collectively with noncompliance implicating the steel certifications.

payments were required until a proper steel certification was submitted. Defendant testified that many contractors did not submit proper steel certifications. (Tr. 302.)

It is uncontested that the contractors submitted standard-form payment applications to CRE and that Defendant, in his role as Architect/Engineer, issued Certificates for Payment.[10] (*See, e.g., Doc. 37, p. 3.*) Defendant, in his role as Owner, then submitted a payment request to the government Funding Agencies representing that the contractors listed therein were owed the amounts being requested. (*See, e.g., id. at p. 2.*) The cover sheets of these payment applications were each in substantially the same form, and provided, in pertinent part, as follows:

> Please accept the attached payment application for towards [sic] the Section 108 loan.
>
> The payment request of [the funds set forth on the attached application and certificate for payment] is being submitted for costs related to construction. The invoice attached is for [the entity listed on the attached application and certificate for payment] for the . . . contract.
>
> Supporting documents have been provided under a prior payment application to the [Funding Agencies].
>
> Please advise if any further documentation is needed.

---

[10] It must be noted that the Contract Documents contemplate different entities filling the roles of architect/engineer and owner. Namely, under the Contract Documents, the architect/engineer would initially receive the application for payment from the Contractors, would review the application, and submit a Certificate for Payment for the portion of the application which the architect/engineer could certify was due. The CVCC project initially utilized this procedure, whereby Erdman Anthony reviewed and signed the Contractors' payment applications, thereby certifying them to Defendant. However, Erdman Anthony's involvement in the project ceased, due at least in part to Defendant's failure to pay them for services rendered (Tr. 53), and Defendant eventually decided to "self-perform the site visits" and certifications (*see* Tr. 539-540). Like much of Defendant's testimony, the court found Defendant's explanation regarding his decision to self-perform these duties to minimize cost to be disingenuous.

(*E.g.,* Gov. 37, p. 2.) Although the Funding Agency would then remit payment directly to CRE in the exact amount requested, the record clearly demonstrates that the payments were intended to be paid to the Contractors represented on the applications. (*See, e.g.,* Tr. 92-93.) Defendant, however, did not pay the identified contractors the amounts he received from the Funding Agencies.

Defendant explained that each of the unpaid Contractors failed to submit the proper steel certifications, and therefore, failed to comply with the federal and state regulations imposed by the Contract Documents. (Tr. 302.) According to Defendant, he refused to pay the non-complying Contractors any amount for the submitted – and approved – payment applications in an attempt to ensure compliance with the statutory requirements. (*Id*.) Defendant argued that he was not required under the Contract Documents to hold the funds disbursed to him through the Funding Agencies, but could rather use those funds on any eligible expenses, including to pay the companies in which he had an interest, so long as the payments were for "costs related to new construction."

In support of his position, Defendant testified that he repeatedly requested that the Contractors submit proper documentation certifying the steel they used in the CVCC project was entirely American-manufactured. Scott Davis, the former project manager of CM, testified that his job involved his collecting the paperwork from the vendors to submit to the different Funding Sources for payment. (*See* Tr. 50-52.) Davis collected the appropriate supporting documentation from the Contractors and vendors and forwarded those documents to Defendant for submission to the Funding Sources. (Tr. 54.) Davis testified that Defendant would continually request steel certifications that had been previously submitted. (Tr. 55.)

Defendant frequently told Davis that the submitted steel certificates were rejected by the Funding Agencies. (Tr. 57.) This, of course, was belied by the fact that the Funding Agencies were satisfying Defendant's payment applications as requested.

Defendant concealed from both Davis and the Contractors the fact that he was receiving payments from the Funding Sources. (*See* Tr. 58-59.) Instead, Defendant shifted the blame for the Contractors' nonpayment away from the actual cause (*i.e.,* that he was deciding to withhold payment due to the alleged noncompliance with steel certifications) to the Funding Agencies, explaining that the Funding Agencies were unsatisfied that the steel used in the project was entirely American. (*See, e.g.*, Tr. 694.) The court found Davis's testimony regarding his collection and submission of steel certifications more credible than Defendant's testimony to the contrary.

Other than Defendant's own testimony, which the court found disingenuous, there was no evidence supporting the claim that Defendant was directed by the Funding Agencies to withhold payment from the Contractors. For example, Defendant testified as follows regarding his ability to satisfy the Contractors' payment applications despite their failure to submit complying steel certifications:

> Q: Had you paid invoices, for example, to some of these contractors where steel certifications had not been filed?
>
> A: We did for a period of time make some payments to contractors expecting that they would in turn catch up on their paperwork. And we released several payments. And we were later chastised for doing so, in fact, by Kaye Goodman in these reports in which she told us that we should make sure we got these

> steel certificates and took care of all these details
> beforehand, before issuing payment.

(Tr. 297.)  Defendant explained his reason for withholding payment as follows:

> We had a lack of steel certificates and instruction from
> Kaye Goodman not to pay if there was no – if there were
> issues with the steel certificates and also under the contract.

(Tr. 302.)  Kaye Goodman, who is employed by an engineering firm that provided consultant services to the Pennsylvania Office of the Budget in connection to the RACP's funding of the CVCC project, directly contradicted Defendant's testimony related to her advising Defendant not to pay the Contractors.  Specifically, Goodman testified that steel certificates, or lack thereof, were never included as a "report finding," and testified that, as of May 2008, it was her position that the steel certificates were in compliance.  (*See* Tr. 618.)  Moreover, Goodman unequivocally denied that she ever advised Defendant to withhold payment or chastised him for issuing payment to a contractor despite its noncompliance (Tr. 619-21), and further explained that she did not even possess the authority to do so (Tr. 647-48).

Defendant presented evidence tending to establish that foreign steel was used in the CVCC project (*see* Def. Exs. 86 & 87); however, he was unable to identify which specific contractor was using the foreign steel (Tr. 363). Nevertheless, despite his uncertainty as to the identity of the allegedly offending contractor, Defendant withheld payment in its entirety from each Contractor.

Defendant continued to withhold entire payments despite the Contractors' repeated requests to be paid.  According to the parties' stipulation,[11]

---

[11]  The stipulation states that the witnesses for each Contractor would testify to the authenticity of the payment applications and total amounts outstanding.  (Doc. 64.)  Each payment
(continued...)

Defendant failed to pay the following amounts for work completed on the CVCC project: (1) $1,225,468.62 to H & R Mechanical; (2) $594,890.00 to Weaver Glass; (3) $308,755.40 to Stong Fire Protection; (4) $390,767.05 to Scheadler Yesco; (5) $622,146.52 to Stewart-Amos Steel; (6) $118,218.11 to Ciesco; (7) $323,057.70 to Macri Concrete; (8) $31,672.47 to H.W. Nauman; and (9) $1,265,237.50 to Herre Brothers (*see* Tr. 672). (Doc. 64-1.) Due to Defendant's failure to fulfill the payment applications, several contractors ceased work on the project and filed mechanic's liens on the property (*see, e.g.*, Def. Exs. 66 & 67), which alerted the Funding Agencies of Defendant's misappropriation of the loan money. Upon discovering CRE's "apparent failure to pay its contractors for [the CVCC] project from funds disbursed to [CM]," the Funding Agencies issued default notices to

---

[11](...continued)
application contained the following certification:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

(*See, e.g.*, Gov. Ex. 37, p. 3.) Accordingly, the court accepts the stipulation as standing for the proposition that the Contractors claimed they performed the work in accordance with the Contract Documents and were entitled to payment thereon.

Defendant, and requested that Defendant "verify disposition of the [funds]."[12]  (Gov. Ex. 29.)

Once the Funding Agencies learned Defendant was withholding payment from the contractors, they refused to honor additional payment applications. Moreover, certain Contractors did not have the opportunity to submit payment applications for portions of the work they had already completed.  As guarantor of the loans fraudulently obtained through this scheme, both Harrisburg City and Dauphin County became required, as guarantors of the loan, to satisfy Defendant's defaulted obligations to repay the Section 108 money.  (Tr. 105, 117.)

II.        **Discussion**

Preliminarily, the court must highlight and define the contours of the issue presented herein, *i.e.*, whether the entities claiming restitution are "victims" under the MVRA.  Stated differently, the court must determine whether Defendant's conduct was the direct and proximate cause of the losses suffered by the entities claiming restitution.  This is not a case, as Defendant suggests, revolving around

---

[12]  It was clear that the filing of mechanic's liens notified Dauphin County that CRE was failing to pay the contractors.  The notice of default on the $3,000,000.00 section 108 loan from Dauphin County provided as follows:

> Cameron Real Estate LP's apparent failure to pay its contractors for this project from funds disbursed to its construction manager violates numerous provisions of the Loan Agreement.
> Specifically as to the County's section 108 loan, three separate payments to your company to pay specific contractor invoices were apparently not directed to the contractors.
> 
> *          *          *
> 
> You are hereby directed to immediately cure the referenced defaults and verify disposition of the referenced draws.  Your failure to do so will result in the County pursuing its remedies under the various loan documents, including your personal guarantee.

(Gov. Ex. 29.)

whether Defendant paid anything other than "eligible expenses" with the money given to him by the funding agencies. Indeed, the court is cognizant that the loan proceeds were distributed to pay other expenses, such as those submitted by IDC, and although IDC may be an "eligible expense," it was also a company in which Defendant had a significant interest. Rather, the question is whether Defendant's actions caused the ultimate failure of the CVCC project, which resulted in the ten claiming Contractors and Metro Bank to remain unpaid and the Funding Agencies to be liable to repay the Section 108-backed loans.

### A.   Legal Standard

The MVRA applies only to certain types of crimes, including an offense "in which an identifiable victim . . . has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). Under the MVRA, the "term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). Moreover, the statute provides that, "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, [a victim includes] any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id*. Additionally, the statute contemplates expanding the definition of victim, mandating the court order restitution to persons other than the victims of the offense if so agreed to by the parties in a plea agreement. 18 U.S.C. § 3663A(a)(3).

Nevertheless, the definition of victim under the statute is not so broad that it permits the court to order restitution to anyone harmed by any activity of the defendant related to the scheme, conspiracy, or pattern. *See United States v. Kones*,

77 F.3d 66, 70 (3d Cir. 1996).[13]   Rather, the plain language of the statute requires an entity be "directly and proximately harmed" by the defendant's criminal conduct to be considered a victim for whom restitution must be ordered.  In *Kones*, the Third Circuit interpreted "direct" harm to the victim to mean a harm that is "closely related to the scheme, rather than tangentially linked." *Id*. at 70.  More recently in *United States v. Fallon*, the Third Circuit adopted a two-prong test in determining whether the harm suffered is a direct result from the criminal conduct of a defendant and whether restitution is appropriate. 470 F.3d 542, 549 (3d Cir. 2006) (quoting *United States v. Vaknin*, 112 F.3d 579, 589 (1st Cir. 1997)).  The first prong states that "[r]estitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct." *Id*.  The second prong of analysis asks the court to consider that "[e]ven if but for causation is acceptable in theory, limitless but for causation is not.  Restitution should not lie if the conduct underlying the offense of conviction is too far removed, either factually or temporally, from the loss." *Id*.

After defining the victims entitled to restitution, the court must "order restitution to each victim in the full amount of each victim's losses . . . without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A).  The "proper amount of restitution is the amount wrongfully taken by the [d]efendant." *United States v. Bryant*, 655 F.3d 232, 254 (3d Cir. 2011).  The Third Circuit has interpreted the MVRA not to authorize consequential damages.

---

[13]   While *Kones*, like *Gov't of V.I. v. Davis*, 43 F.3d 41, 45 (3d Cir. 1994), interpreted the Victim and Witness Protection Act ("VWPA"), which was partially superceded by the MVRA, its reasoning is authoritative on how to interpret "victim" in the MVRA.  *See Quillen*, 335 F.3d 219, 222 n. 4 (3d Cir. 2003); *United States v. Akande*, 200 F.3d 136, 140 (3d Cir. 1999) (noting that the definition of victim is "virtually identical" in the MVRA and VWPA, and looking to "case law that construes either section").

*United States v. Quillen*, 335 F.3d 219, 222 (3d Cir. 2003) (citing *United States v. Simmonds*, 235 F.3d 826, 833 (3d Cir. 2000)). Instead, restitution must be limited to "an amount pegged to the *actual* losses suffered by the victims of the defendant's criminal conduct," and "based upon *losses directly resulting* from such conduct." *Id.* (emphasis in original) (quoting *Gov't of V.I. v. Davis*, 43 F.3d 41, 45 (3d Cir. 1994)). If the victim's loss is at issue, the government has the "burden of demonstrating the amount of the loss sustained by a victim as a result of the offense" by a preponderance of the evidence. 18 U.S.C. § 3664(e); *United States v. Lopez*, 503 F. App'x 147, 149 (3d Cir. 2012).

**B.  Analysis**

**1.  Status as "victims" for purposes of the MVRA**

Based on a review of the record, the court finds that the claiming entities were directly and proximately harmed by Defendant's conduct, and concludes that these entities are victims and therefore entitled to restitution.

It is uncontested that Defendant submitted payment applications for the aforementioned Contractors for specific work they had performed on the CVCC project, received money from the Funding Agencies in the amounts requested in the payment applications, and withheld the money from the Contractors. However, Defendant contends that the Government failed to prove the Contractors met the "mandatory contractual regulatory conditions precedent to perfect their contractual right to receive payments" for the construction work performed pursuant to the Contract Documents. (Doc. 81, p. 13 of 31.) Defendant reasons that, because the Contractors used foreign steel in the CVCC project or otherwise failed to submit appropriate steel certifications, they were not entitled to receive payment and

therefore, did not have a property interest harmed by Defendant's refusal to remit payment. (*See id.*)

The Government presented evidence to prove the complaining Contractors performed the work on the contract. Specifically, the stipulation states that the witnesses for each contractor would testify to the authenticity of the payment applications and total amounts outstanding. (Doc. 64.) The payment applications each contain the following certification:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

(*See, e.g.*, Gov. Ex. 37, p. 3.) Thus, the stipulation alone provides a sufficient basis to find that the Contractors performed work according to the Contract Documents and that they were rightfully owed the amounts claimed. However, Defendant maintains that, because the Contractors failed to comply with the steel and wage regulations, the amount outstanding was, in fact, never owed. The court does not find this argument convincing.

Certainly, Defendant presented evidence that could support a finding that foreign steel was present on the CVCC project (*see* Gov. Exs. 86 & 87) and testified that certain contractors failed to submit proper steel certifications (*see, e.g.*, Tr. 293-94). Nevertheless, Defendant did not – indeed, he could not – identify which Contractor had used foreign steel. (Tr. 363.) Moreover, the record is devoid of any credible evidence demanding a finding that any one of the Contractors used foreign

steel. Rather, the record establishes that, before the CVCC project lost funding, both an employee of CM (Tr. 53-56) and representatives of the Funding Agencies (Tr. 618) believed the Contractors' steel certificates were submitted in accordance with the requirements set forth in the Contract Documents.

Even assuming, *arguendo*, that the Contractors did incorporate some foreign steel into their work on the project, the Contract Documents did not entitle Defendant to withhold entire payments from Contractors. The provision cited by Defendant in support of his actions provides that the Owner may withhold payments for the steel or cast iron product that has an outstanding certification. (J.Ex. 1, § 3.9.) Contrary to Defendant's assertion, this provision does not entitle the Owner to withhold entire payments that he otherwise accepted and certified to the Funding Agencies as being owed to the Contractors. Based on the record, the court finds that the Contractors had an interest in the amounts applied for, and certified as due by, Defendant. Therefore, the court concludes that Defendant's decision to pay other "eligible expenses," namely those expenses allegedly incurred by companies in which Defendant had an interest, was the reason the money was diverted from the Contractors that the money was intended to pay.[14]

The record further established that, after numerous unsuccessful attempts by the Contractors to collect the outstanding payments, they terminated their work on the project and, at least some, filed mechanic's liens. (*See* Tr. 677-78.) The filing of the mechanic's liens alerted the Funding Agencies that Defendant was

---

[14] During these proceedings, defense counsel argued that Defendant was entitled, under the applicable regulations, to pay any eligible expenses with the money he received from the funding agencies. This argument misses the mark. The question is not whether the regulations prevented Defendant from doing what he did, but rather whether Defendant's actions caused the Contractors' losses. Based on its review of the record, the court answers the latter question in the affirmative.

24

not remitting payment to the Contractors, which was a violation of certain agreements. (Gov. Ex. 29.) This caused the Funding Agencies to issue default notices to Defendant, and ultimately, withhold further payment on certified payment applications. (*See id.*) The stoppage of funding caused the project to come to a halt and resulted in the Funding Agencies, namely Harrisburg City and Dauphin County, to be directly obligated to repay the Section 108 funds they disbursed to Defendant, meaning that HUD will reduce future funding by the amount that the department is not being repaid.

Additionally, Defendant concealed his actions by continuing to misrepresent to the Funding Agencies that the Contractors were being paid, and misrepresent to the Contractors that funding to him was being withheld by the Funding Agencies. Without these misrepresentations, the Funding Agencies would have learned of Defendant's actions earlier. Thus, because the parties stipulated that, if called, witnesses would support the total amount claimed as set forth in the exhibit, and because the court finds that the failure of the CVCC project was caused by Defendant's illegitimate withholding of funds from the Contractors, the court concludes that Harrisburg City and Dauphin County have suffered the losses as reflected on the stipulation as they are now obligated to assume the repayment of the publicly funded loans.

The court would be remiss not to address Defendant's position that the cause of the project's failure, the Contractors remaining unpaid, and the funding agencies being obligated to repay the Section 108 money, was the result of the contractors' filing of mechanic's liens. As stated, during the hearing, defense counsel zealously argued that the Funding Agencies stopped remitting payment to

Defendant due to the mechanic's liens being filed on the property.  While the court acknowledges both that the contractors filed mechanic's liens and that such an action may have been prohibited by the Contract Documents, the court disagrees that this event breaks the causal link in the failure of the CVCC project.  An individual is proximately harmed as a result of the defendant's conduct if there are no intervening causes, or if there are such causes, if those causes are directly related to the defendant's offenses.  Thus, even if the filing of the mechanic's liens could be viewed as an intervening cause, the intervening cause was directly related to and caused by Defendant's conduct, namely his withholding payment from the Contractors for work completed on the CVCC project while distributing the funds to companies in which he had a personal interest.  Concisely stated, Defendant's diversion of these funds to his company, rather than to the Contractors that the Funding Agencies believed were receiving the payments, caused the Contractors to file mechanic's liens, which caused the Funding Agencies to stop issuing payments, which caused the project to fail, and ultimately caused the Funding Agencies to be obligated to repay the Section 108 loans.  The court finds each of these events to be a foreseeable consequence of Defendant's actions.

The court has little trouble determining that Defendant's inappropriate misappropriation of funding from Harrisburg City and Dauphin County caused the Contractors to remain unpaid for amounts to which they were entitled.  The court further finds that it was reasonably foreseeable for several Contractors to stop work and file mechanic's liens against the subject property due to Defendant's continued failure to pay.  The court does not find convincing Defendant's disingenuous, post-hoc excuse that he withheld payment from the Contractors due to their

noncompliance with the federal regulations and instead paid other eligible expenses. Thus, the court concludes that Defendant's misappropriation of funds caused the CVCC project to fail, caused the Contractors to suffer losses for amounts expended on the project, and caused the Funding Agencies to be responsible for the repayment of amounts loaned to Defendant for the project. Thus, each of the entities identified on the stipulation is a victim under the MVRA.

## 2. <u>Amount of loss</u>

Despite the parties' stipulation as to the amounts the entities claim they lost as a direct and proximate result of Defendant's conduct, the court will enter an order of restitution for $20,943,635.13 rather than the $21,487,057.58 as claimed on the stipulation. The ordered amount excludes losses that are unsupported by the record to be directly and proximately caused by Defendant's conduct.

### a. <u>Claims for unpaid work and loan disbursements</u>

Initially, the court notes that Defendant does not challenge the accuracy or veracity of any amount claimed by the victims. Rather, Defendant simply argues that his actions were not the direct and proximate cause of the harms. Thus, in light of the stipulation, Defendant apparently concedes that, if the Contractors and lenders are determined to be victims under the MVRA, they are entitled at least to the disbursed payments or amounts claimed for work done on the CVCC project. Based on the foregoing discussion, the court finds that the non-repayment of principal on the Metro Bank, Dauphin County, and Harrisburg City loans and the harms suffered by the Contractors were the direct and proximate results of Defendant's conduct, and therefore, will award $6,570,396.80 to Metro Bank as the amount disbursed under the private loan, $2,752,450.64 to Dauphin County as the amount disbursed under

Dauphin County's Section 108-backed loan, $240,000.00 to the City of Harrisburg as the principal disbursed under the Mayor's Office of Economic Development Loan, $3,512,777.70 to the City of Harrisburg as the amount it will have to repay as guarantor under the CDBG loan, and $4,880,213.37 as the total amount owed to the Contractors for their uncompensated work performed on the CVCC project.

### b. Contractors' claims for attorneys' fees

Defendant does, however, challenge several of the contractors' claims for attorneys' fees. (*See, e.g.,* Doc. 84, ¶¶ 41-45.) Specifically, Weaver Glass claims it is owed $47,561.29 for attorneys' fees, Stong Fire Protection claims it is owed $84,332.50 for attorneys' fees, and Herre Brothers, Inc., claims it is owed $194,198.79 for attorneys' fees. (Doc. 64-1.) Defendant argues that their claims for attorneys' fees are incidental and consequential damages, and are otherwise not collectible under the MVRA. (Doc. 84, ¶ 45.)

The Third Circuit has interpreted the MVRA as not authorizing consequential damages. *Quillen*, 335 F.3d at 222 (citing *Simmonds*, 235 F.3d at 833). Defendant cites *Gov't of V.I. v. Davis*, 43 F.3d 41, 46 (3d Cir. 1994) (applying the VWPA), and *Simmonds*, 235 F.3d at 833, for the proposition that attorneys' fees are consequential damages, and are, therefore, not recoverable under the MVRA. Defendant's argument assumes the existence of a bright-line rule prohibiting restitution for attorneys' fees. Such a rule does not exist.

Initially, the court highlights that the proper question is not whether attorneys' fees can be the subject of an award, but whether the attorneys' fees

incurred were a loss directly resulting from the offense, or a consequential loss.[15]  In

*Davis*, the Third Circuit reasoned that, under the plain language of the VWPA, the

amount of restitution may not include compensation for legal expenses "unless

[those] costs are sustained as a direct result of the conduct underlying the offense of

conviction."  43 F.3d at 46.  In fact, the *Davis* court recognized that legal fees "might

plausibly be considered part of the [victim]'s losses."  *Id*.  The plain language of the

MVRA gives the district court authority to determine which of the victim's expenses

may be appropriately included in a restitution order.  The statute requires that the

included expenses be "necessary," and that they be "incurred [by a victim] during

participation in the investigation or prosecution of the offense or attendance at

proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  The statute does not

otherwise limit the type of expenses that may be included.

In *United States v. Amato*, 540 F.3d 153, 159-60 (2d Cir. 2008), the

Second Circuit held that, "necessary . . . other expenses" contemplated by Section

3663A(b)(4) may include attorneys' fees, provided that the court finds, by a

preponderance of the evidence, that: (1) such expenses were necessary; (2) they were

---

[15]  Some courts have framed the issue in terms of foreseeability.  For example, the First
Circuit, in an unpublished opinion, noted that "[f]requently attorney's fees will not be recoverable," but
added that determination as to recoverability "entails a fact-intensive inquiry that is best conceptualized
in terms of foreseeability."  *United States v. Corey*, 77 F. App'x 7, 11 (1st Cir. 2003).  In *Corey*, the
court found that attorneys' fees were subject to restitution in a bank fraud case because legal expenses
"are necessarily incurred when a heavily regulated secured lender mitigates its losses by foreclosing on
collateral."  *Id*. at *12.  The court added, however, "[t]he fees at issue here are thus entirely different in
kind from those incurred where a crime victim initiates a civil lawsuit on the basis of the underlying
offense."  *Id*.; *see also Davis*, 43 F.3d at 45-46 (concluding that an award of restitution pursuant to
VWPA cannot include litigation costs to recover balance of funds in bank acounts because such
expenses are too far removed from the underlying criminal conduct); *United States v. Mikolajczyk*, 137
F.3d 237, 245-46 (5th Cir. 1998) (including the victim's attorney's fees in restitution where they were a
direct result of the defendant's fraud rather than a voluntary act taken by the victim to recover property
or damages).

incurred while participating in the investigation, prosecution, or attendance at proceedings regarding the offense; (3) they were incurred by a victim as defined by the MVRA; and (4) they do not require unduly complicated determinations of fact. *See United States v. Gupta*, 925 F. Supp. 2d 581, 584 (S.D.N.Y. 2013) (citing *Amato*, 540 F.3d at 160). The court will adopt this test for purposes of determining whether the record establishes that the Contractors are entitled to the attorneys' fees requested.

In the instant case, while the stipulation provides that, if called, a witness of Herre Brothers, Weaver Glass, and Stong Fire Protection would testify that the company expended the amounts on attorneys' fees, the record lacks any evidence tending to establish whether these figures represent necessary expenses incurred while participating in the investigation, prosecution, or attendance at proceedings regarding Defendant's conduct. In short, while the amount of attorneys' fees is not at issue, the nature of the fees remains unclear. Based on the record established as a result of multiple days of hearing, the court cannot determine the basis for these attorneys' fees, let alone whether these fees were necessarily incurred as a result of Defendant's conduct.[16] The court cannot find, by a preponderance of the evidence, the basis, necessity, or nature of the claimed attorneys' fees, and therefore, the court concludes that the Government has failed to sustain its burden in establishing the Contractors' entitlement to the amounts claimed as attorneys' fees.

---

[16] Indeed, Richard McBride testified that Herre Brothers is out of business because the company was not paid for its involvement in the CVCC project. (Tr. 664-65.) Certainly, the court will not consider attorneys' fees incurred in connection with Herre Brothers' declaration of bankruptcy to be necessary and incurred while participating in the investigation, prosecution, or attendance at proceedings regarding the offense.

### c. **Interest claimed on the MOED and Metro Bank loans**

In challenging certain claims, Defendant merely argues that he was not the direct and proximate cause of the claimed harm, and stresses that consequential and incidental expenses are not recoverable. For example, Defendant simply argues that the $68,328.54 claimed as MOED loan interest by the City of Harrisburg and the $2,100,071.08 claimed as interest by Metro Bank represent amortized interest and are incidental and consequential damages, and thus not collectible under the MVRA. (*See* Doc. 84, ¶¶ 46 & 47.)  The court disagrees.

The MVRA aims to provide victims with full and fair compensation for their losses. Limiting restitution to the return of the principal loan amount would be inadequate, because "[f]oregone interest is one aspect of the victim's loss." *United States v. Smith*, 944 F.2d 618, 626 (9th Cir. 1991) (interpreting the VWPA); *see also Davis*, 43 F.3d at 47 (construing VWPA and allowing award of prejudgment interest). Indeed, a return on a loan is the bread and butter of the business of any lender, especially a financial institution. As the Third Circuit stated in *Davis*, "Lost interest translates into lost opportunities, as it reflects the victim's inability to use his or her money for a productive purpose." 43 F.3d at 47. When Harrisburg City and Metro Bank, relying on Defendant's representations of how the funds would be spent, loaned money to Defendant, the entities presumably made a considered judgment about the optimal allocation of their resources, thereby foregoing other revenue-generating opportunities. Accordingly, the court finds that the $68,328.54 claimed by the City of Harrisburg on the MOED loan and the $2,100,071.08 claimed

by Metro Bank on the private loan represent interest that was lost as a direct result of Defendant's fraud.[17]

### d.    Late charges claimed by Metro Bank

The same cannot be said for the $217,329.87 claimed by Metro Bank for late charges. The record is entirely undeveloped with regard to the basis of Metro Bank's claim for late charges. Moreover, unlike receiving interest payments, late charges are not the reason a lender makes a loan. The court cannot conclude, based on the facts presented herein, that the late charges resulted from Defendant's conduct with relation to the improper usage of the loaned funds, and the court will not include that claim in the restitution award.

### e.    Maintenance and security costs and recording fees claimed by Metro Bank

Defendant also challenges Metro Bank's claims of $818,850.00 for maintenance and security costs, and $547.00 for recording fees, arguing that these amounts represent incidental and consequential damages. The court disagrees.

The MVRA requires that the district court "shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). Here, Defendant misappropriated money from the Funding Agencies, and as a consequence, failed to pay the Contractors, causing the project to come to a halt and causing Metro Bank, as mortgagee, to foreclose on the property. It is reasonably foreseeable that Metro Bank necessarily incurred expenses in its attempt to mitigate its losses by foreclosing on collateral. Certainly, Metro Bank would not have incurred these particular losses but for Defendant's default on the mortgage, caused

---

[17] The court notes that the sole issue addressed in this memorandum is the amount of *restitution* and not the amount of *loss*. *Cf.* U.S.S.G. § 2B1.1, cmt n.3(D)(i).

by the project's cessation due to Defendant's failure to remit payment to the Contractors. As the stipulation represents Defendant's concession that, if called, a witness for Metro Bank would testify to the accuracy of the amounts Metro Bank claims it lost for maintenance and security costs and recording fees incurred by foreclosing on the CVCC property, the court will award Metro Bank $819,397.00 as the stipulated amount of expenses incurred as a result of Defendant defaulting on the CVCC mortgage obligations.

### f.    Offset value for mortgaged property

Defendant argues that, because "[t]here is no evidence as to the value of the land and structure" (Doc. 84, ¶ 54), it "would be speculative" to enter an order of restitution "without Metro Bank, County of Dauphin, and City of Harrisburg [being able to perfect] their security interest in the [CVCC] Property by foreclosing on their mortgages" (*Id*. at ¶ 55). While this is a valid point, it does not provide a basis for declining to award restitution.

As stated, in the case of a crime "resulting in damage to or loss or destruction of property of a victim," the MVRA provides that the order of restitution shall require the defendant to:

> (A) return the property to the owner of the property or someone designated by the owner; or
>
> (B) if return of the property under subparagraph (A) is impossible, impractical, or inadequate, pay an amount equal to –
>
> > (i) the greater of –
> >
> > > (I) the value of the property on the date of the damage, loss, or destruction; or

> (II) the value of the property on the date of
> sentencing, less
>
> (ii) the value (as of the date the property is returned)
> of any part of the property that is returned.

18 U.S.C. § 3663A(b)(1). Thus, the plain language of the MVRA provides that the restitution award is reduced by "the value (as of the date *the property* is returned) of any part of *the property* that is returned." 18 U.S.C. § 3663A(b)(1)(B)(ii) (emphasis supplied). Read in the context of the statute, "the property" means the property originally taken from the victim. Where, as here, cash is the property taken, the restitution amount is reduced by the eventual cash proceeds recouped once any collateral securing the debt is sold, because only when the collateral real estate is sold does the victim mortgagee receive money (proceeds from the sale) which was the type of property lost. Accordingly, the amount of restitution owed to any mortgagee, namely Metro Bank as primary holder and Harrisburg City and Dauphin County as secondary holders, will be reduced by the eventual offset value from a foreclosure sale on the subject property. *See United States v. Himler*, 355 F.3d 735, 745 (3d Cir. 2004) (affirming district court's order of restitution in the amount of victim's loss minus the amount that would eventually be recouped from the future sale of the condominium).[18]

## III.      Conclusion

Based on the foregoing, the court finds that Defendant's conduct was the direct and proximate cause of the failure of the CVCC project, and therefore, of the losses suffered by the Contractors, Metro Bank, and municipal Funding Sources. Because the court concludes that the Contractors were entitled to payments for the

---

[18] The court does not agree with Metro Bank that the property has no value.

work they performed on the project, the court will order Defendant to pay restitution in the amounts reflected on the stipulation. However, the court concludes that the record does not support a finding that Defendant's conduct caused the claimed attorneys' fees. For these reasons, the court will award restitution to: (1) H & R Mechanical in the amount of $1,255,468.62;[19] (2) Weaver Glass in the amount of $594,890.00;[20] (3) Stong Fire Protection in the amount of $308,755.40;[21] (4) Scheadler Yesco in the amount of $390,767.05;[22] (5) Stewart-Amos Steel in the amount of $622,146.52;[23] (6) Ciesco in the amount of $118,218.11;[24] (7) Macri

---

[19] The total amount awarded is comprised of $218,513.03 for payment application four, $478,023.52 for payment application five, $255,511.35 for payment application six, $194,223.43 for payment application seven, and $79,197.29 held by Defendant as retainage.

[20] The total amount awarded is comprised of $207,540.00 for payment application one, $106,610.00 for payment application two, and $280,740.00 for payment application three.

[21] The total amount awarded is comprised of $19,681.56 for payment application one, $58,749.30 for payment application two, $72,970.20 for payment application three, $90,000.00 for payment application four, and $67,354.34 for work performed for which the contractor did not have the opportunity to submit a payment application.

[22] The total amount awarded is comprised of $319,203.00 for payment application one and $71,564.05 for work performed for which the contractor did not have the opportunity to submit a payment application.

[23] The total amount awarded is comprised of $466,622.00 for payment application one, $129,050.00 for payment application two, and $66,186.00. The stipulation, however, only claims $622,146.52 for the contractor. That is the number awarded.

[24] The total amount awarded is comprised of $204,852.25 for an amount invoiced, less $86,634.14 for an amount the contractor received.

Concrete in the amount of $323,057.70;[25] (8) H.W. Nauman in the amount of $31,672.47;[26] and (9) Herre Brothers, Inc., in the amount of $1,265,237.50.[27]

 With regard to restitution claimed by Metro Bank, the court concludes that Defendant's conduct underlying the offenses was the direct and proximate cause of his default on the mortgage, and that Metro Bank suffered losses in the form of disbursed principal, lost interest, expenses, and fees. However, the court does not find that Defendant's conduct was the direct and proximate cause of the late charges claimed by Metro Bank. Accordingly, the court will award restitution to Metro Bank in the amount of $9,489,864.88,[28] less any amount recouped following the sale of the mortgaged property.

 Lastly, because the court finds Defendant's conduct was the cause of the CVCC's failure and Defendant's inability to repay the Section 108-backed loans, it will award restitution to Dauphin County in the amount of $2,752,450.64[29] and to the

---

[25] The total amount awarded is comprised of $139,699.80 for payment applications one and two, $103,864.50 for payment application three, $168,547.50 for payment application five, $75,357.00 for payment application six, $22,491.00 for payment application seven, and $56,662.20 for work performed for which the contractor did not have the opportunity to submit a payment application, less $243,564.30 for payments received.

[26] The total amount awarded is comprised of $31,672.47 for work performed for which the contractor did not have the opportunity to submit a payment application.

[27] The total amount awarded is comprised of $ 1,733,409.99 for work performed less a payment in the amount of $468,172.49.

[28] The total amount awarded is comprised of $6,570,396.80 for principle disbursed on the private loan, $2,100,071.08 for interest accrued on the loan, $818,850.00 for maintenance and security incurred for the mortgaged property, and $547.00 for recording fees claimed in connection with the foreclosure.

[29] The total amount awarded reflects the amount Dauphin County disbursed to Defendant under the Section 108-backed loan program.

City of Harrisburg in the amount of $3,512,777.70.[30]  Finally, because the court finds that Defendant's conduct was the cause of the CVCC's failure and Defendant's inability to repay the MOED loan, it will award restitution to the City of Harrisburg in the amount of $308,328.54.[31]

s/Sylvia H. Rambo<br>
United States District Judge

Dated:  October 15, 2013.

---

[30]  The total amount awarded reflects the $6,162,255.62 the City of Harrisburg will have to repay under the CDBG loan, less $2,212,350.00 for amounts allocated and undisbursed under the loan, less $3,97,569.15 for the interest that the undisbursed funds will accumulate over the repayment term, less $39,558.77 for amounts repaid by CRE.

[31]  The total amount awarded reflects the $240,000.00 disbursed as principle under the Mayor's Office of Economic Development loan, and $68,328.54 for interest accrued on the loan.